IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 1:18-CR-150-WKW-SMD |
| | ) | |
| ROBERT WILLIAMS, JR. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.     BACKGROUND**

Robert Williams, Jr. ("Williams") is charged with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g) and possession of cocaine and oxycodone in violation of 21 U.S.C. § 844(a). Indictment (Doc. 1). Evidence supporting these charges was seized during a late-night traffic stop of Williams' motorcycle conducted by Corporal William J. Kaufmann ("Officer Kaufmann") of the Dothan Police Department. Officer Kaufmann initially pulled the motorcycle over for speeding. As Officer Kaufmann approached the bike, Williams passed a Newport cigarette box to his passenger riding on the back, and she hid it between her legs. Officer Kaufmann looked inside the cigarette box and discovered cocaine. He then frisked Williams for weapons and discovered a 9mm pistol tucked in his waist band. The cigarette box also contained two Acetaminophin-Oxycodone pills.

Williams filed a Motion to Suppress arguing that Officer Kaufmann's search of the cigarette box was unlawful and that this unlawful search led to the subsequent pat-down where the gun was discovered. (Doc. 22) at 3-4. On April 22, 2019, the undersigned held

a suppression hearing. Transcript (Doc. 31). At the hearing, Williams raised a new argument that the traffic stop itself was unlawful because Officer Kaufmann lacked reasonable suspicion that Williams was speeding. (Doc. 31) at 39. Williams seeks to suppress all evidence seized and statements made during the traffic stop. (Doc. 22). Upon consideration of Williams' Motion (Doc. 22), the Government's Response (Doc. 27), and the evidence and arguments presented at the suppression hearing, the undersigned Magistrate Judge recommends that Williams' Motion to Suppress be denied.

## II. FACTS

The facts are essentially undisputed.[1] *See* Mot. to Suppress (Doc. 22) at 1-2. In the early morning hours of November 27, 2015, Officer Kaufmann was conducting a night-shift patrol with a trainee, Officer Christopher Hardman, in a marked police car. (Doc. 24-2) at 1; (Doc. 31) at 4. They were idling along the roadside near Montgomery Highway and Montezuma Avenue in Dothan, Alabama, monitoring traffic using a Stalker radar gun mounted to the dash of the police car. (Doc 24-2) at 2; (Doc. 31) at 5, 17. At approximately 2:15 a.m., Officer Kaufmann clocked a motorcycle traveling northbound on Montgomery Highway doing 57 mph in a 40 mph zone. (Doc. 31) at 5; (Doc 24-2) at 2. He pulled out behind the motorcycle, turned on his emergency lights, and made a traffic stop. *Id.*

---

[1] Officer Kaufman was the only witness called at the suppression hearing. Although there are minor discrepancies between his police report (Doc. 24-2) and his testimony at the hearing, these differences are not material. Generally, the court credits the contemporaneous police report written within an hour of the traffic stop over testimony given at the hearing over three and-a-half years later. At the hearing, defense counsel stated that he had subpoenaed the passenger on the motorcycle, Ursula Mack, to testify, but she had not appeared. (Doc. 31) at 2-3. The defense decided to proceed without calling Ms. Mack. *Id.* at 36.

The motorcycle, a black 2005 Harley-Davidson Street Glide, pulled over, and Officer Kaufmann observed a black male rider, later identified as Williams, and a black female passenger, later identified as Ursula Mack ("Mack"), on the bike. Officer Kaufmann and Officer Hardman exited the police car and approached the motorcycle. (Doc. 24-2) at 2; (Doc. 31) at 6. Officer Kaufmann noted that both Williams and Mack were wearing clothing that identified them as members or affiliates of the Outcast Motorcycle Club ("Outcast M.C."). (Doc. 24-2) at 2, 4; (Doc. 31) at 7, 29-30, 31.

Officer Kaufmann was familiar with the Outcast M.C. (Doc. 31) at 10. The Outcast M.C. has a clubhouse a short distance from the police station in Dothan. *Id.* at 11. Officer Kaufmann understood it to be an "outlaw motorcycle gang" whose members "regularly partake in acts of violence." *Id.* at 10. Officer Kaufmann knew from police intelligence that the Outcast M.C.'s annual Dothan rally was taking place that weekend. *Id.* at 27. He understood that Outcast M.C. chapters from different states were in Dothan for the rally, and that a few hundred members were at the Dothan clubhouse. *Id.* at 27. He also knew that during the previous year's rally, the Outcast M.C. had a large fight at their clubhouse in which somebody was severely beaten and suffered a bad head injury. *Id.* at 28.

Approximately one hour before the traffic stop at issue here, Officer Kaufmann had been called as backup on another traffic stop on the same side of town involving another motorcycle ridden by an Outcast M.C. member with a female passenger. *Id.* at 8-10, 16. The officer making that stop, Officer Dodson, called for backup when a large number of people began to show up at the scene. *Id.* at 9. Police recovered three handguns from the

3

Outcast M.C. rider at this earlier traffic stop, and Officer Kaufmann personally observed "the weapons that were taken off the suspect." *Id.* at 16.

Turning back to the stop at issue here, as Officer Kaufmann approached the Harley, Williams turned around and handed a box of Newport cigarettes he was holding in his left hand to Mack. (Doc. 24-2) at 2; (Doc. 31) at 11. Mack, still seated on the bike, then hid the cigarette box between her legs. *Id.* Officer Kaufmann testified that, in his "experience as a law enforcement officer, seeing an object transferred from one person to another in the sight of police, . . . would be some type of furtive movement." *Id.* at 12. Officer Kaufmann asked Williams why he handed the cigarette box to Mack, and he responded, "why do you need to know?" (Doc. 24-2) at 2; (Doc. 31) at 12-13. Officer Kaufmann then asked Mack if she would hand the box to him. (Doc. 24-2) at 4; (Doc. 31) at 12. She did not respond. *Id.* At this point, Williams told Mack to give the box to Officer Kaufmann, and she handed it to him. (Doc. 24-2) at 4; (Doc. 31) at 13.

Officer Kaufmann testified that he believed that the cigarette box might contain a weapon of some kind such as a razor blade or pocket knife. (Doc. 31) at 32. The box was unwrapped, and he flipped open the top and discovered a clear plastic baggy containing a white powdery substance that he believed to be cocaine. (Doc. 24-2) at 5; (Doc. 31) at 14. He secured the cigarette box in his cargo pocket and patted-down Williams for weapons. *Id.* at 14-15. He immediately felt a large, hard object on Williams's right hip that he believed to be a pistol. *Id.* at 15. He lifted Williams's shirt and discovered a Hi Point Arms C9 9mm pistol tucked in his waistband. (Doc. 24-2) at 5; (Doc. 31) at 14. He removed

4

the pistol, gave it to Officer Hardman, and handcuffed Williams. (Doc. 31) at 15. Officer Kaufmann asked Williams if he had a permit for the pistol, and he replied "no." (Doc. 24-2) at 5; (Doc. 31) at 15. He searched the motorcycle and found a billy club in the left saddle bag. (Doc. 24-2) at 5. As the traffic stop progressed, approximately 15 people showed up in the area. (Doc. 31) at 29.

Investigator Thomas Davis arrived at some point and took charge of the investigation. (Doc. 24-2) at 5. His report states that the cigarette box contained two small partial sandwich bags that held a white powder substance that field tested positive for cocaine. *Id.* It also contained two 325mg/5mg Acetaminophin-Oxcodone (Percocet) pills. *Id.* Williams was placed under arrest for possession of cocaine and carrying a pistol without a permit. *Id.* Officer Kaufmann also issued Williams traffic citations for speeding and driving with a revoked license. *Id.* After being advised of his *Miranda* rights, Williams stated that the cocaine was for personal use. *Id.*

### III. LEGAL STANDARD

The Fourth Amendment protects individuals from unreasonable search and seizure. *See* U.S. Const. amend. IV. When a defendant moves "to suppress evidence garnered through a *warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution." *U.S. v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (emphasis original). To sustain this burden, the "Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment." *Id.*

## IV. DISCUSSION

### A. The Traffic Stop

At the hearing, Williams argued for the first time that the traffic stop itself was unlawful because "there was no reasonable suspicion that he was committing a traffic violation." (Doc. 31) at 39. Although the court could decline to reach this issue because it was not raised in the suppression motion (Doc. 22), the Government introduced sufficient evidence to decide this issue and, therefore, the undersigned will address it.

"A traffic stop is a seizure within the meaning of the Fourth Amendment." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)). "[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred[,]" *Whren v. United States*, 517 U.S. 806, 810 (1996), and "[i]t goes without saying that speeding is a traffic violation that may properly justify a traffic stop." *U.S. v. Monzon-Gomez*, 244 F. App'x 954, 959 (11th Cir. 2007).

Here, it is undisputed that Officer Kaufmann used a radar gun mounted on the dash of his patrol car to determine that Williams was travelling 57 mph in a 40 mph zone. (Doc. 24-2) at 2; (Doc. 31) at 17-23. The Fourth Amendment does not even "require the use of radar detection to establish probable cause [for] speeding," and an officer may pull a vehicle over for speeding "solely on the basis of his visual observation." *Monzon-Gomez*, 244 F. App'x at 959. A police radar speed reading conclusively establishes probable cause, and Officer Kaufmann in fact issued Williams a citation for speeding. (Doc. 24-2) at 4.

Williams argues that the Government has not established the reliability of the radar because Officer Kaufmann did not know when the radar gun was last calibrated and because there is no electronic log, photograph, or printout showing the device's reading. (Doc. 31) at 39. However, "[w]ith regard to traffic stops under the Fourth Amendment, the question is simply whether a law enforcement officer has sufficient cause to believe that a traffic law has been violated, not whether such a violation can be successfully prosecuted in court." *Monzon-Gomez*, 244 F. App'x at 959 n. 3. Moreover, Officer Kaufmann testified quite specifically that he tested the accuracy of the device at the beginning and end of his shift using two tuning forks, and that it was working properly. *Id.* at 19-20. Thus, the radar speed reading here is more than sufficient to give Officer Kaufmann probable cause to believe that Williams was speeding, making the traffic stop lawful.

    B.    **Search of the Cigarette Box**

        1.    **Consent**

The next issue is whether Officer Kaufmann violated the Fourth Amendment by flipping open the Newport cigarette box and looking inside. (Doc. 22) at 4. The Supreme Court has observed that "the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view," and the cigarette box falls within this general rule. *U.S. v. Ross*, 456 U.S. 798, 822-823 (1982). However, the Fourth Amendment is not implicated here because Williams consented to the search.

7

A search is reasonable and does not require a warrant if an officer obtains voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *U.S. v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Officers conducting routine traffic stops may request consent for a search. *Purcell*, 236 F.3d at 1280. The Government has the burden of proving that consent to search was given voluntarily, as an independent act of free will, and not as mere acquiesence to a police claim of lawful authority to search. *Florida v. Royer*, 460 U.S. 491, 496 (1983). To be considered voluntary, consent to a search "must be the product of an essentially free and unconstrained choice." *Garcia*, 890 F.2d at 360. Whether consent was voluntarily given is a question of fact to be determined by the totality of the circumstances. *U.S. v. Mendenhall*, 446 U.S. 544, 557 (1980); *Purcell*, 236 F.3d at 1281. The Eleventh Circuit instructs that when evaluating consent given during a traffic stop, the court should look at several factors "including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *Purcell*, 236 F.3d at 1281.

Here, the totality of the circumstances establishes that Williams' consent was voluntary. When Officer Kaufmann arrived at Williams' motorcycle, Mack had the cigarette box hidden between her legs. (Doc. 24-2) at 2; (Doc. 31) at 11-12. He asked Williams why he had given the box to Mack, and he responded, "why do you need to know?" *Id.* This shows that Williams was not intimidated or in any way coerced by the mere presence of a uniformed police officer. Officer Kaufmann next asked Mack if she

8

would hand him the cigarette box, and she did not comply. *Id.* This demonstrates that compliance was understood to be voluntary. Williams then told Mack to give Officer Kaufmann the cigarette box, and she did. *Id.* This entire exchange took only a few seconds, and Officer Kaufmann did not draw his weapon, threaten Williams in any way, or even raise his voice. Under these circumstances, Williams' consent to the search was voluntary.

### 2. *Terry* Protective Search

In addition to Williams' consent, Officer Kaufmann was authorized to seize and briefly search the box in order to protect his personal safety during the traffic stop. *United States v. Gibbs*, 917 F.3d 1289, 1295 (11th Cir. 2019). This is a separate and independent ground authorizing the search. "[T]raffic stops are especially fraught with danger to police officers," *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (internal quotes and citation omitted), and officers making traffic stops may take all reasonably necessary steps to protect their personal safety. *Gibbs*, 917 F.3d at 1295; *Purcell,* 236 F.3d at 1277. Such measures include "conducting a protective search of the driver, the passengers, and the vehicle." *Id.* (internal citations omitted).

An officer making a traffic stop may conduct a protective search when he "possesses a reasonable belief based on specific and articulable facts" that the driver or passenger is dangerous and "may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (internal quotes and citation omitted). Here, Officer Kaufmann stopped a motorcycle with two people on board at two in the morning. (Doc. 24-2) at 2. The rider and passenger both wore clothing that identified them as members or affiliates of an outlaw

9

motorcycle club, the Outcasts M.C., that "regularly partake in acts of violence." (Doc. 31) at 10. Approximately one hour before, Officer Kaufmann personally participated in a traffic stop of another Outcasts M.C. rider who was carrying three pistols. *Id.* at 16. As he approached the motorcycle, Officer Kaufmann observed Williams hand a Newport cigarette box to Mack, and she hid it between her legs. (Doc. 24-2) at 2. When Officer Kaufmann asked Williams why he had given the box to Mack, he responded "why do you need to know?" *Id.*

From these specific and articulable facts, it was reasonable for Officer Kaufmann to conclude that Williams might be dangerous and that he was trying to conceal a weapon such as a razor blade or small knife hidden in the cigarette box. To conduct a protective search, an officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Here, we have an outlaw motorcycle club member trying to conceal something hidden in a cigarette box between his female passenger's legs as police approached his bike during a late-night traffic stop. It was reasonable for Officer Kaufmann to conclude that this was likely to be a weapon. After all, a male police officer would be reluctant to search between Mack's legs while Williams could readily grab a weapon hidden there. And, even after Officer Kaufmann possessed the box, it was still within Williams' reach. Given these facts, Officer Kaufmann was justified in conducting a brief protective search that included flipping open the cigarette box and glancing inside. *See, e.g., United States v. Durrah*,

2009 WL 10688823, at *12 (N.D. Ga. May 11, 2009) ("[f]urtive movements or hand gestures, when undertaken in response to the presence of police, may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and frisk"). The fact that Officer Kaufmann discovered drugs in the cigarette box rather than a weapon does not offend the Fourth Amendment. *Michigan v. Long*, 463 U.S. 1032, 1050 (1983) ("[i]f while conducting a legitimate *Terry* search . . . the officer . . . should discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its suppression").

### C. Inevitable Discovery

Finally, as an independent and alternative ground, the gun and drug evidence obtained during the traffic stop here is admissible under the inevitable discovery doctrine. The Eleventh Circuit explains that "'[u]nder the exception for inevitable discovery, the government may introduce evidence that was obtained by an illegal search if the government can establish a reasonable probability that the evidence in question would have been discovered by lawful means.'" *United States v. Delva*, __F.3d __, 2019 WL 1894413, at *10 (11th Cir. 2019) (*quoting United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015). A preponderance of the evidence standard governs this doctrine. *U.S. v. Terzado-Madruga*, 897 F.2d 1099, 1114 (11th Cir. 1990). The Government has easily satisfied its burden here.

Williams argues that "[a]ll of the evidence in this case was discovered as a result of the unlawful seizure and subsequent search of the cigarette pack." (Doc. 22) at 4.

11

However, the evidence negates this and shows that Officer Kaufmann would have performed a protective pat-down search of Williams whether he first looked in the cigarette box or not. As is detailed above, Office Kaufmann was confronted with outlaw motorcycle club members who tried to hide something from police during a late-night traffic stop. Even if Officer Kaufmann had not looked inside the cigarette box, there is more than a reasonable probability that he would have patted Williams down for weapons anyway in order to protect his personal safety during the traffic stop. For the reasons stated above, such a pat-down would be lawful, and it would have inevitably led to discovery of the 9mm pistol hidden in Williams' waistband.

Once the firearm was discovered, Officer Kaufmann would have arrested Williams for carrying the pistol without a permit, and he would have discovered the drugs hidden in the cigarette box in a search incident to arrest. When a traffic stop develops into an arrest, an officer may search the passenger area of the vehicle and the contents of any containers found therein. *See United States v. Goddard*, 312 F.2d 1360, 1364 (11th Cir. 2002); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1222 (11th Cir. 1993); *see also United States v. Jenkins*, 496 F.2d 57, 72-73 (2d Cir. 1974) ("Thus the trooper could have lawfully arrested [the driver] and then searched the motorcycle saddlebag, which was within grabbing distance, as incident to this arrest."). He may also search the person arrested. *See United States v. Lyons*, 403 F.3d 1248, 1253 (11th Cir. 2005). It so happens that during the brief traffic stop at issue here, Officer Kaufmann looked inside the cigarette box first and then discovered the pistol, but discovery of the pistol first and then the drugs is just as likely.

Officer Kaufmann did not frisk Williams solely because he found cocaine in the cigarette box. He patted him down because he reasonably believed that Williams was dangerous and might be armed. The evidence shows that he would have done so whether or not he discovered the cocaine. Accordingly, the Government has established a reasonable probability that the gun and drug evidence here would have been discovered by lawful means even if Officer Kaufmann's seizure and search of the cigarette box violated the Fourth Amendment.

## IV.  CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Williams's Motion to Suppress (Doc. 22) be DENIED. It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before May 20, 2019**.[2]  Any objections filed must specifically

---

[2] Due to the current timing of trial, the undersigned has shortened the usual period for filing objections. *See Sabal Trail Transmission, LLC. v. 7.72 Acres In Lee Cty., Alabama*, 2016 WL 10789585, at *1 (M.D. Ala. 2016) ("where exigencies exist, a court may shorten the time for filing objections."); *SEC v. Lauer*, 2016 WL 3225306, *2 (S.D. Fla. Mar. 3, 2016)(shortening the usual fourteen day objection period due to concerns about the fiscal quarter end); *United States v. Williams*, 2016 WL 304320 (M.D. Ala. Jan. 22, 2016)(Mendoza, J.)(noting that the magistrate judge ordered that due to exigent circumstances, the objections period was shortened to two days and adopting the report and recommendation); *Esco Marine, Inc. v. SS Pacific Star*, 2011 WL 5026192 at *1, n.1 (E.D. Cal. Oct 21, 2011)(Mueller, J.)(shortening the time period for objections because "exigencies of the calendar require[d]" it)(quoting *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978), *cert denied*, 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978)(holding that trial court did not err in providing parties less than the [then-applicable] full ten-day period to file objections to the magistrate judge's report and recommendation where exigencies existed, stating that the ten-day objections period constituted a "maximum, not a minimum.")); *Alvarez v. Tracey ex rel. Gila River Indian Cnty. Dep't of Rehab. & Supervision*, 2012 WL 1038755, at *7 (D. Ariz. Feb. 10, 2012)("[i]n it discretion, the Court will shorten the time for filing of objections")(citing *Tripati v. Drake*, 908 F.2d 977 (9th Cir. 1990)(the court need not afford the parties the full amount of time allotted for filing objections; the time allotted is a maximum, not minimum)).

identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); see *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); see also *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 9th day of May, 2019.

/s/ Stephen M. Doyle
UNITED STATES MAGISTRATE JUDGE